In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1701

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

EUGENE MULLINS,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 596— **Amy J. St. Eve**, *Judge*.

ARGUED SEPTEMBER 23, 2014 — DECIDED SEPTEMBER 3, 2015

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Eugene Mullins, the former Director of Public Affairs and Communications for Cook County, Illinois, was indicted for wire fraud and bribery because he fraudulently arranged service contracts for several vendors and accepted over $34,000 in bribes from them. Jurors convicted him of four counts of wire fraud, 18 U.S.C. § 1343, and four counts of bribery, *id*. § 666. In this appeal Mullins challenges the sufficiency of the evidence support-

ing his convictions and contends that the prosecutor engaged in misconduct. Because the evidence was sufficient to convict Mullins of wire fraud and bribery offenses and because no harmful prosecutorial misconduct occurred, we affirm.

## I. BACKGROUND

Beginning in 2008 Mullins served as Cook County's Director of Public Affairs and Communications. During his time at that post, Cook County used a two-tiered system for approving service contracts. Contracts requiring the county to spend $25,000 or more had to be approved by its Board of Commissioners. Contracts that required the county to spend less than $25,000, however, required the approval of only the county's purchasing agent. The government charged Mullins and his codefendants—vendors to whom the county awarded contracts—with manipulating this system to their benefit.

The scheme was as follows. Mullins helped these vendors obtain payment under county service contracts, without the vendors having to complete any work, and in exchange they paid Mullins $34,748 in bribes. Specifically, Mullins helped Gwendolyn Moody, Clifford Borner, and Kenneth Demos secure contracts that ostensibly promoted census awareness. He assisted Gary Render in obtaining a contract that supposedly helped county residents affected by floods in 2008. And he aided Michael Peery, who sought a contract designed to promote energy efficiency.

The prosecution opened its case with the testimony of Mullins's secretary, Annette Goldsmith. She testified that to be approved for a contract under $25,000 a vendor must provide her with a proposal, an invoice of work, and tax

forms so that she could create a justification letter. She explained that Mullins, the purchasing agent, the county comptroller, and others would review and sign the forms, invoice, and justification letter. Goldsmith testified that the county generally paid the selected vendor after the vendor had completed the contracted work. But, she testified, this procedure was ignored for the contracts awarded to Moody, Demos, Render, Borner, and Peery. Goldsmith identified Mullins's initials on the justification letters and invoices for their contracts. Mullins, however, later denied that the initials were his, reading them as "LU" rather than "EM."

Next to testify were the vendors and codefendants involved in Mullins's contract scheme—Borner, Demos, Moody, Render, and Peery. The government agreed to defer prosecution of them, under charges of misprision of felony, in exchange for their testimony and admissions of guilt.

Borner testified about the census contract, which was invoiced at $24,995.00. To prepare to secure that contract, Borner testified that he provided Mullins with some paperwork but he did not draft the invoice. Instead, Mullins created Borner's invoice and attributed contract work to the nonexistent "Clifford Borner and Associates," a fictitious company to which the contract work was awarded. Borner admitted that before receiving the contract he did not know anything about census awareness or reporting. He also conceded that he received over $24,000 for his contract, even though he did not do enough work to justify that sum (he mainly passed out fliers door-to-door). Borner further testified that Mullins required him to remit $5,000 to a "subcontractor," which he did by bringing the money to an elevator in cash and handing it to Mullins.

Mullins's lawyer suggested during Borner's cross exami-
nation that Borner was lying. Before trial the prosecution
had disclosed to Mullins's lawyer that, as Borner was prepar-
ing for trial, he told the prosecution that he recently learned
that three years earlier a federal agent had threatened to shut
down his wife's day care business. That threat supposedly
came during the government's investigation into public con-
tracts awarded to her business in 2010. Despite this disclo-
sure, on cross examination Borner denied reporting this
threat to the prosecution—leading to the suggestion that
Borner was lying. On redirect examination, Borner clarified
himself: Although three years earlier he had not known of or
told the prosecution about the supposed threat, he did re-
port it to the prosecution shortly before trial, when his wife
mentioned it to him. He also added that, in fact, he believed
that no threats were actually made to her.

Demos also testified about the census contracts. He stat-
ed that he had not created the invoices (Mullins had) and
that he had not performed $25,000 worth of work, despite
the payment from Cook County. Demos recalled that when
Mullins gave him the check from Cook County Mullins told
him that he should think of it as a gift. In testimony similar
to that from Borner, Demos explained that Mullins had in-
structed him to pay over $8,000 to Mullins so that Mullins
could pay an unnamed "subcontractor."

Next up was Moody, who also testified about a census
contract. She stated that her initial invoice amount had been
too high, so Mullins directed her to alter it so that it fell un-
der $25,000. Like the others, she also received a check from
Cook County before performing any work. (She returned the
check because of a problem with her business name.)

Render testified about the flood-relief grant. He stated that Mullins had decided on a final amount for his contract. Render also explained that Mullins had wanted him to return $9,000 from the contract award to Mullins. Render gave Mullins the cash because he thought Mullins deserved it and because he wanted to ensure that he could get future work from Cook County.

Peery testified about the funds he received to do outreach work for energy efficiency. He stated that Mullins had helped him, too, draft his contract proposal and the accompanying invoice outlining the anticipated work. After Peery was awarded the contract, Mullins told him that he would need to pay Mullins $12,000 in cash, which Peery did. Peery stated that Mullins told him that the money was going to a subcontractor but Peery thought that it "wasn't adding up" and that no subcontracts actually existed.

Mullins presented witnesses in his defense. These included several character witnesses and Karen Crawford, a Cook County employee. Crawford testified that Cook County did not have a rule that prohibited vendors from being paid before working, but she admitted that in her experience prepayment was not the norm. Mullins also testified in his own defense. He stated that he had recommended vendors but had not chosen them, had arranged for Cook County employees to assist vendors who had difficulty completing their proposals, and had not created, drafted, or overseen any of the contracts at issue in the trial.

During closing argument, the government emphasized that the vendors had all received their payments up front. To burnish the point the prosecutor stated that *all* employees from Cook County, including the defense witnesses, "said

the same thing: 'we don't pay in advance.'" Mullins objected to this statement during closing, calling it a misstatement of Crawford's testimony. The judge then instructed the jurors to rely on their own recollection of the testimony. The prosecutor proceeded with the closing argument, re-characterizing the previous statement to conform with Crawford's testimony that upfront payment was not the norm.

The jury found Mullins guilty of all the charges except one count of wire fraud. The district court sentenced him to 51 months' imprisonment and this appeal followed.

## II. ANALYSIS

On appeal Mullins makes two arguments. First, he maintains that the evidence is insufficient to convict him of either wire fraud or bribery. Second, he contends that the prosecutor suborned perjury, intimidated witnesses, and made improper statements during closing arguments. We discuss each argument in turn.

### A.      Sufficiency of the Evidence

Mullins begins by arguing that the government produced insufficient evidence to convict him of wire fraud and bribery. Sufficiency challenges are very difficult to win because we view the evidence in the light most favorable to the verdict and reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *See United States v. McClellan*, No. 14-2449, 2015 WL 4451052, at *3 (7th Cir. July 21, 2015); *United States v. Hosseini*, 679 F.3d 544, 557 (7th Cir. 2012). The government alleges that Mullins waived arguments about the sufficiency of the evidence, but we need not decide whether the government is correct because, viewing the evidence in the light most favorable to the ver-

dict, we conclude that the record contains abundant evidence to support the convictions.

To prove wire fraud, the government must establish that there was (1) a scheme to defraud in which the defendant participated, (2) intent to defraud, and (3) use of interstate wires. 18 U.S.C. § 1343; *United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012). Mullins submits that he did not scheme to defraud Cook County. He maintains that he simply expedited time-sensitive contracts and broke no county rules. And he adds that even if there was a scheme, he did not participate in it because he did not personally draft proposals or approve the contracts. The jury had more than sufficient reason to disbelieve these assertions.

A fraud scheme exists when there is a willful act to receive, deceive, or cheat to cause financial loss to another. *See United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010). Here ample evidence establishes that Mullins intended to cheat Cook County out of money. According to the witnesses, Mullins altered proposals and wrote invoices to fit below the $25,000 approval threshold and thereby avoided detection by the Board of Commissioners. He then helped the vendors receive payments before they completed any work and despite never delivering services commensurate with the county's payments to them. By helping to arrange for these proposals, invoices, and payments for incomplete work, the scheme and Mullins's participation in it is adequately supported. *See Sheneman*, 682 F.3d at 629 (finding sufficient evidence where defendant took active role in misleading victim bank). Accordingly, the government adequately proved wire fraud.

To prove bribery under 18 U.S.C. § 666(a)(1)(B) the government must show that a public agent solicited "corruptly anything of value" in connection with a transaction of $5,000 or more. 18 U.S.C. § 666(a)(1)(B); *see United States v. Blagojevich*, No. 11-3853, 2015 WL 4433687, at *4 (7th Cir. July 21, 2015); *United States v. Robinson*, 663 F.3d 265, 271 (7th Cir. 2011). An agent acts corruptly when he understands that the payment given is a bribe, reward, or gratuity. *See United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015). To attack the sufficiency of the bribery conviction, Mullins raises two arguments, but they are both meritless.

Mullins first contends that he did not act corruptly because, he says, other departments requested the work and approved the contracts from the vendors. But Mullins himself testified that *his* input and recommendation were important in choosing vendors. And he used his influence corruptly. As already observed, Mullins altered the invoices to remain under $25,000 and kept himself in the approval process. Later, when the vendors received their fees, Mullins required and received cash kickbacks under the ruse, as Peery explained, that the kickback payments were for "subcontractors." In reality the payments were given to Mullins to secure future awards from Cook County, as Render testified. Thus, jurors could infer that the cash that Mullins received from vendors was a reward—a bribe—for buying his influence in obtaining their contracts.

Mullins also contends that he cannot be convicted of bribery because the government produced no evidence of quid pro quo, such as the vendors receiving something in return for the bribe. But they did receive something—their contracts. In any case, evidence of quid pro quo is not neces-

sary to establish a violation of § 666(a)(1)(B). *See United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011); *United States v. Gee*, 432 F.3d 713, 714–15 (7th Cir. 2005). Thus, the bribery counts are intact.

### B.    Prosecutorial Misconduct

Mullins next argues that the convictions should be overturned because he identifies three instances of prosecutorial misconduct: suborning perjury, intimidating witnesses, and making improper statements during closing arguments. We take these contentions in turn.

Mullins argues that the prosecutor twice elicited perjured testimony at trial. He contends that Mullins's secretary, Goldsmith, testified falsely about his initials on documents. And, he maintains Borner lied about whether he had reported to the prosecution any threats to shut down his wife's business. Both arguments are unpersuasive.

Goldsmith's testimony was not perjurious. She merely testified to her lay opinion that the initials on the proposals belonged to Mullins. Whether or not her opinion was correct, her testimony was permissible. *See United States v. Tipton*, 964 F.2d 650, 655 (7th Cir. 1992) (lay witness may give opinion about handwriting); *United States v. Binzel*, 907 F.2d 746, 749 (7th Cir. 1990) (same).

Borner's situation is more complicated, but his testimony was not perjurious either. It is true that during cross examination he denied reporting to the prosecution that anyone had threatened to shut down his wife's day care business, even though the prosecution had disclosed before trial the fact of his recent report. But the government solicited from Borner on redirect the clarification that three years earlier,

when the threats were supposedly made, he had not known of or reported them to the prosecution; only when he learned about the threats shortly before trial did he report them. The prosecution thus properly elicited truthful and complete testimony, *see United States v. Guadagno*, 970 F.2d 214, 219–20 (7th Cir. 1992), ensuring that the jury had all truthful information before it when making its decision.

Mullins next argues that the prosecution intimidated Peery into testifying against him. An allegation of witness intimidation requires proof that a witness was persuaded into providing false testimony to the court through physical force or threats. *See United States v. Holt*, 460 F.3d 934, 938 (7th Cir. 2006); *United States v. Balzano*, 916 F.2d 1273, 1291 (7th Cir. 1990). During cross-examination Peery said that the agent who had questioned him during the pretrial investigation was "gruff" and that the questioning process itself was "intimidating." Peery, however, also stated that he testified truthfully and did so to obtain the terms of his deferred-prosecution agreement. Given the record as a whole, Mullins has not proven that force or improper threats impelled false testimony.

Mullins's final contention concerns the prosecutor's statements during closing argument. He asserts that the prosecution misstated Crawford's testimony about the County's practice concerning advanced payment before completed work. Misstatements of evidence during closing argument can be improper, *see United States v. Wolfe*, 701 F.3d 1206, 1214 (7th Cir. 2012), but it is rarely reversible error, *see United States v. Anderson*, 450 F.3d 294, 300 (7th Cir. 2006). Here the prosecutor argued that every witness had said that Cook County did not pay on service contracts in advance of

completed work, even though Crawford had testified that the County could do so but that the practice was unusual.

To determine whether the misstatement prejudiced Mullins and requires reversal we consider whether (1) Mullins invited the remark, (2) the judge offered curative instructions, (3) the defense could have rebutted the misstatement, and (4) the weight of the evidence against Mullins is nonetheless strong. *See United States v. Durham*, 766 F.3d 672, 685 (7th Cir. 2014); *United States v. Myers*, 569 F.3d 794, 799 (7th Cir. 2009).

Looking at the record as a whole, we are confident that the misstatement did not prejudice Mullins. First, the defense immediately objected to the prosecutor's misstatement. Second, the judge promptly issued a curative instruction, reminding the jurors that their recollection of the evidence controlled. Third, the prosecutor later altered the statement, correctly telling the jury that Crawford had testified that it was sound practice for Cook County to pay vendors after the vendors completed work. Fourth, this misstatement came against the backdrop of the abundant evidence showing that Mullins solicited bribes for contracts and fraudulently altered vendors' proposals and invoices through email to avoid detection. Thus, this one minor misstatement did not infect the trial with unfairness such that a new trial is necessary. *See United States v. Johnson*, 655 F.3d 594, 599, 602 (7th Cir. 2011) (upholding decision not to grant new trial when single misstatement, which was immediately corrected, was given by the prosecution during opening statement); *United States v. McMath*, 559 F.3d 657, 667–68 (7th Cir. 2009) (finding that improper remarks at trial when combined with a curative jury instruction did not affect trial fairness).

### III. CONCLUSION

Accordingly, we AFFIRM the judgment of the district court.