In the

# United States Court of Appeals

### For the Seventh Circuit

No. 24-2495

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES CUI,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19-cr-00322(3) — **Virginia M. Kendall**, *Chief Judge.*

ARGUED OCTOBER 29, 2025 — DECIDED JANUARY 9, 2026

Before SYKES, ST. EVE, and MALDONADO, *Circuit Judges.*

ST. EVE, *Circuit Judge*. Federal prosecutors charged Charles
Cui with bribing Edward Burke, the longest serving alderman
in Chicago history, to secure Burke's influence in a permit
matter before the Chicago Department of Buildings
("CDOB"). Following a six-week trial, a jury convicted Cui.
The district court then denied Cui's motions for acquittal and
for a new trial and sentenced him to 32 months in prison. Cui
appeals, raising challenges to the sufficiency of the evidence,

the jury instructions, the court's admission of certain evidence under Federal Rule of Evidence 404(b), and his sentencing, all of which the district court rejected. We affirm.

## I. Background

Through Irving Park Property Holdings LLC ("IPPH"), Cui owned 4901 West Irving Park Road, commercial real estate in Chicago's 45th ward. In 2015, Cui leased the property to Binny's Beverage Depot. The lease gave Binny's the exclusive right to use a thirty-foot pole sign adjacent to the property. To use the pole sign, however, Binny's needed a permit from the CDOB. The CDOB denied the permit in spring 2017, finding the City had rezoned the area for pedestrian use and the pole sign was not eligible for a nonconforming use as the property had remained vacant for too long.

The denial of the permit posed a particular problem for Cui because a year earlier he had entered into an agreement with the City to finance the redevelopment of the property. Cui would receive up to $2 million in tax increment financing, conditioned on Binny's continuing to lease the property. After the CDOB denied the pole sign permit, Cui and Binny's negotiated a rent reduction if Cui could not resolve the permit denial. The denial also jeopardized Cui's financing as Binny's could pull out of the lease altogether if the CDOB did not issue the permit.

Cui turned to Burke for help. Cui's friend, Raymond Chin, had originally introduced the two. Burke served on the City Council, was chair of the City's finance committee, and, concurrently, operated a private law firm—Klafter & Burke—that represented clients in property tax appeals before the City. Burke was neither Cui's alderman nor the alderman for the

site of the pole sign, but he was influential. He had served on the City Council for nearly 50 years by then.

Cui first reached out to Burke on August 23, 2017. After calling and leaving a voicemail, Cui emailed Burke (at his personal email address), explaining that "zoning" had denied the pole sign permit because the "pole sign was abandoned for several years, and now is illegal." He asked Burke to "look into the matter, and advise how to proceed," adding that "Binny's really needs it, otherwise they will either cancel the lease, or ask for significant rent deduction." Burke did not respond.

The next day, Cui forwarded the email to Chin and said "[m]aybe he thinks there is [a] conflict of interest, because of his position. I'll ask him to represent me for property tax appeal, which will be a big bite, comparing with this." Cui also emailed his current property tax appeal lawyer, George Reveliotis, explaining that he wanted "Edward Burke [to] handle 4901 W. Irving Park property tax appeal for me, at least for this year? I have [a tax increment financing] deal going with the City, and he is the Chairman of Finance Committee. He handled [*sic*] his tax appeal business card to me, and I need his favor for my [financing] money. In addition, I need his help for my zoning etc for my project. He is a powerful broker in City Hall, and I need him now. I'll transfer the case back to you after this year." Cui directed Reveliotis to continue working on appeals for other properties he owned. Reveliotis replied that he understood, adding "[t]here's nothing like Chicago politics!"

Shortly after, Cui emailed Burke again, copying Chin: "Dear Mr. Burke, I currently have this property 4901 … W. Irving Park Road under development. I may need your

representation for tax appeal.… Please let me know if you have time to handle this matter for me." An hour later, Chin called Burke and explained that "the guy that I brought to introduce to you, he's been trying to get ahold of you to … get some tax work, and … apparently some legal—[.]" Burke responded that he had seen Cui's earlier email and would "get together with him and … see if we can do somethin[g] to help him."

Burke responded to Cui's second email the next day, saying that someone from his firm would reach out to Cui about the property tax appeal work. Cui replied, thanking Burke and asking if Burke would "be able to represent [him] for the pole sign matter."

On August 30, an attorney at Burke's firm reached out to Cui to formalize the tax appeal work. The same day, Burke directed his assistant to reach out to CDOB Commissioner Judy Frydland to "ask her to take a look at that uh, situation where [Cui] called about [] Binny's liquor store … and the pole [sign]" and "see if [Frydland would] … review it and [] if they … can … help [Cui]." Burke called Frydland the next day, and his assistant wrote Cui, confirming that Frydland would reach out to him.

On September 1, Cui emailed his zoning attorney, Tom Moore, an image purporting to show the pole sign in use. Cui asked Moore to send the photograph to the CDOB and ask for a continuous use exception, which Moore did. But, in an email to Frydland and Moore, CDOB First Deputy Commissioner Matt Beaudet affirmed the permit denial, in part because he personally knew the pole sign had not been in continuous use and he concluded that Cui had photoshopped the

photograph. Cui forwarded Beaudet's message to Burke and then emailed Frydland about the photograph.

A couple weeks later, Frydland confirmed the permit denial to Burke's assistant and relayed that Cui had submitted a photoshopped image. Burke's assistant told Burke that Frydland had "been trying to look into how to get this to work. But she can't seem to figure out a way." At Frydland's suggestion, Burke later contacted Zoning Administrator Patricia Scudiero, asking her to look into the pole sign issue. But Scudiero took no action. Ultimately, the CDOB did not reverse its denial of the pole sign permit.

On September 5, Cui and Klafter & Burke signed a contingency fee agreement for the tax appeal work. The agreement provided that Cui would pay Burke's firm 33% of any savings the firm obtained for Cui during the appeal. Burke's firm worked on Cui's tax appeal, but it could not reduce his tax liability. As a result, Cui did not have to pay Burke's firm.

In 2018, as part of a broader investigation into Burke, the FBI interviewed Cui. During the investigation, the government issued a search warrant and, later, obtained a grand jury subpoena for Cui's records. The search warrant revealed some of the emails between Cui and Burke, Cui and Chin, and Cui and Reveliotis. In responding to the grand jury subpoena, Cui produced his records to the government but failed to include certain key emails with Reveliotis and with Chin.

On May 30, 2019, a grand jury indicted Burke on a series of corruption-related counts, stemming from his dealings with Cui and other, unrelated issues. The grand jury also indicted Cui on one count of offering a bribe to a public official, 18 U.S.C. § 666(a)(2), three counts under the Travel Act, 18

U.S.C. § 1952(a)(3), and one count of making a false statement to the government, 18 U.S.C. § 1001(a)(2).

Burke, Cui, and a third codefendant, Peter Andrews, went to trial. Before trial, the district court denied Cui's motion in limine to exclude the photoshopped pole sign photograph from evidence. Cui argued the photograph was impermissible propensity evidence under Federal Rule of Evidence 404(b), but the district court found the photograph admissible under Rule 404(b)(2)'s permitted uses.

The trial lasted six weeks. Cui asked the court to modify the Seventh Circuit's pattern jury instructions for § 666(a)(2). Specifically, Cui sought to clarify the bribery and gratuity theories of liability and to amend the instructions' definition of "corruptly" for purposes of the statute. The district court denied Cui's requests. During the trial, the Supreme Court granted certiorari in *Snyder v. United States*, No. 23-108 (Dec. 13, 2023), on the question of whether § 666(a) criminalizes gratuities. In response, the government clarified it was not seeking to convict Cui under a gratuity theory, but only under a bribery theory.

The jury found Cui guilty on all five counts. It also convicted Burke on thirteen counts. The district court denied Cui's motions for acquittal and for a new trial, Fed. R. Crim. P. 29, 33, finding the evidence sufficient and Cui's other arguments without merit. *See United States v. Cui*, No. 19-cr-00322, 2024 WL 3848513 (N.D. Ill. Aug. 16, 2024). Before the district court's decision, the Supreme Court held that accepting a gratuity is not a crime under § 666(a). *See Snyder v. United States*, 603 U.S. 1, 19 (2024). In its decision, the district court explained that *Snyder* did not impact Cui's convictions. *Cui*, 2024 WL 3848513, at *12–14.

The district court sentenced Cui to 32 months in prison and two years' supervised release, and it sentenced Burke to 24 months in prison. At sentencing, the court considered and found warranted the disparity between Cui's 32-month sentence and Burke's 24-month sentence. *See* 18 U.S.C. § 3553(a)(6). It also applied a two-level sentencing enhancement because it found Cui had obstructed justice by failing to produce the two key emails to the government. *See* U.S.S.G. § 3C1.1.

This appeal followed.

## II. Discussion

Cui brings a series of challenges to both his conviction and sentence. Grouped together, he raises: (1) sufficiency of the evidence challenges to each of his convictions; (2) jury instructions challenges to the § 666(a)(2) instructions; (3) a Federal Rule of Evidence 404(b) challenge to the introduction of the photoshopped pole sign photograph at trial; and (4) challenges to his sentence. We consider each in turn.

### A. Sufficiency of the Evidence

We start with Cui's sufficiency of the evidence challenges to his three convictions: bribery, 18 U.S.C. § 666(a)(2), the Travel Act, 18 U.S.C. § 1952(a)(3), and making a false statement to the government, 18 U.S.C. § 1001(a)(2).

We review de novo the district court's decision denying Cui's motion for acquittal. *United States v. Lee*, 77 F.4th 565, 572 (7th Cir. 2023); *see also United States v. Clark*, 140 F.4th 395, 409–10 (7th Cir. 2025) (reviewing sufficiency of the evidence de novo). We owe deference to the jury's verdict, not to the district court's "assessment of the trial evidence." *United States v. Jones*, 79 F.4th 844, 853 (7th Cir. 2023). Given this

deference and viewing the evidence in the light most favorable to the government, *United States v. Perryman*, 20 F.4th 1127, 1133 (7th Cir. 2021), we will overturn a conviction only when "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt," *United States v. Leal*, 72 F.4th 262, 267 (7th Cir. 2023) (quoting *United States v. Godinez*, 7 F.4th 628, 638 (7th Cir. 2021)). This standard is "nearly insurmountable." *Id.* (quoting *United States v. Grayson Enters.*, 950 F.3d 386, 405 (7th Cir. 2020)).

**1. Section 666(a)(2)**

Section 666(a)(2) provides that

> [w]hoever … corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; shall be fined under this title, imprisoned not more than 10 years, or both.

Its companion provision, § 666(a)(1)(B), applies to those who "corruptly solicit[, ] demand[,] … accept[,] or agree[] to accept, anything of value .…" In other words, § 666(a)(2) covers the "bribe giver" while § 666(a)(1)(B) covers the "bribe taker."

A bribe is a payment "made or agreed to *before* an official act in order to influence the official with respect to that future official act." *Snyder*, 603 U.S. at 5. Section 666(a) has always reached "bribes." Historically, however, the circuits disagreed over whether § 666(a) also reached "gratuities." A gratuity is a payment "made to an official *after* an official act as a

token of appreciation." *Id.* The difference between a bribe and a gratuity is one of timing. Under § 666(a)(2), a bribe occurs when one corruptly gives, offers, or agrees to give the thing of value *before* the official acts, while a gratuity exists when one gives, offers, or agrees to give the thing of value *after* the official has acted. We consistently held that § 666 reached gratuities in addition to bribes. *United States v. Hawkins*, 777 F.3d 880, 881 (7th Cir. 2015) (collecting cases).

The Supreme Court took up the circuit split, rejected our position, and held that § 666 criminalizes bribery, not gratuities. *See Snyder*, 603 U.S. 1. It reiterated that, from the bribe-taker's perspective, bribes exist when the official takes or accepts payment before acting and "American law generally treats bribes as inherently corrupt and unlawful." *Id.* at 5. But, it noted, gratuities are more complicated: Because gratuities exist when the official takes or accepts payment after acting, "[s]ome gratuities can be problematic, [while o]thers are commonplace and might be innocuous." *Id.* at 5–6. The Court held that § 666 does not reach gratuities, *id.*, explaining that "[b]y including the term 'rewarded[]' [in the statute,] Congress made clear that the timing of the agreement is the key, not the timing of the payment, and thereby precluded such a potential defense." *Id.* at 19 (quoting § 666(a)). Ultimately, a "state or local official can violate § 666 when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act. But a state or local official does not violate § 666 if the official has taken the official act before any reward is agreed to, much less given." *Id.* (citation modified).

The Supreme Court decided *Snyder* after Cui had filed his post-trial motions. On appeal, Cui relies on *Snyder* for much

of his sufficiency of the evidence argument. He presents three specific sufficiency challenges to his § 666(a)(2) conviction.

First, Cui contends the government's evidence, at best, only supported the now-impermissible gratuity theory of liability because, he says, after *Snyder* bribery requires a "preexisting agreement" between the one giving and the one taking the bribe—Cui and Burke, respectively. Cui claims there is no evidence of a "preexisting agreement" before Burke contacted the CDOB about the pole sign because the earliest they could have "agreed" was September 5, when Cui signed the formal agreement with Burke's law firm.

To be sure, *Snyder* did not address this issue. And we need not reach Cui's argument regarding a "preexisting agreement" because the evidence is sufficient to affirm Cui's conviction even if such an agreement is required. But we do note that § 666(a)(2) penalizes one who "*gives, offers, or agrees* to give anything of value." (emphasis added). Such language is broader than Cui's read. *See, e.g.*, *United States v. Whiteagle*, 759 F.3d 734, 753 (7th Cir. 2014) ("Because it is phrased in the disjunctive, section 666(a)(2) separately proscribes giving, offering, or agreeing to give a thing of value to someone with the corrupt intent to influence a transaction covered by the statute."); *United States v. O'Donovan*, 126 F.4th 17, 44 (1st Cir. 2025) (explaining § 666(a)(2) "does not require a belief that there was a completed agreement; rather, as the Eighth Circuit has explained, the offeror, provided he acts with corrupt intent, 'completes the crime' of federal programs bribery upon the offering of a bribe 'even if the payee does nothing or immediately turns him in to law enforcement'" (quoting *United States v. Suhl*, 885 F.3d 1106, 1113 (8th Cir. 2018))); *cf. United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167,

1177, 1179 n.5 (9th Cir. 2024) ("When the defendant is the *bribe-giver*, [] the bribery offense does not require an agreement to enter into a quid pro quo with the public official.… '[T]he crime of offering a bribe is completed when a defendant expresses an ability and a desire to pay the bribe.'" (quoting *United States v. Rasco*, 853 F.2d 501, 505 (7th Cir. 1988))); *United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013) ("[Section 201(b)(1)] expressly criminalizes a mere 'offer' of something of value with the intent to influence an official act. That the official need not accept that offer for the act of bribery to be complete is evident from the structure of the statute, which defines two separate crimes: the act of offering a bribe and the act of soliciting or accepting a bribe.").

Even if § 666(a)(2) requires a "preexisting agreement," the "agreement" does not need to be formal, signed, or in writing. In the federal bribery context, 18 U.S.C. § 201(b), "[t]he agreement need not be explicit." *McDonnell v. United States*, 579 U.S. 550, 572 (2016). Rather, it "is up to the jury, under the facts of the case, to determine whether the public official agreed." *Id.*; *see also United States v. Synowiec*, 333 F.3d 786, 789 (7th Cir. 2003) ("It is not necessary for a briber to be familiar with *Williston on Contracts* in order to make an illegal offer."). This rule similarly applies to bribery under § 666(a). *See Snyder*, 603 U.S. at 10–11 ("Congress modeled the text of § 666(a)(1)(B) … on § 201(b) ….").

Cui "offer[ed]" the bribe in his August 23 and 24 emails to Burke asking for help with the pole sign permit and raising the property tax appeal work when Burke did not respond to his initial request. Burke "accepted" when he responded to Cui on August 25 and agreed to take on Cui's property tax appeal. Only after Burke responded did he act by directing

his assistant to contact the CDOB about the pole sign permit. It is irrelevant that Cui did not formalize the tax appeal work with Burke's firm until September 5. Based on this evidence, the jury reasonably could have found an agreement sufficient to support bribery by August 25, *before* Burke acted.

Second, Cui invokes § 666's safe harbor provision. Section 666(c) shields from liability the "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." *See United States v. Robinson*, 663 F.3d 265, 272 (7th Cir. 2011) ("[C]ompensation paid in the ordinary course shall not be construed as a bribe."). At trial, Cui raised § 666(c) as an affirmative defense, *United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010), and the district court instructed the jury accordingly on § 666(c)'s protection. ECF No. 384, at 243.

Whether wages are bona fide is a question of fact for the jury to decide. *Lupton*, 620 F.3d at 802. When evaluating if § 666(c) applies, some factors to consider include the underlying corrupt intent for the job, whether the compensation was paid in the ordinary course, the defendant's actions and behavior, how the money was spent, and the defendant's entitlement to the money. *See Robinson*, 663 F.3d at 272; *Lupton*, 620 F.3d at 801–02; *United States v. George*, 841 F.3d 55, 62–63 (1st Cir. 2016) (rejecting broad definition of "bona fide salary" under § 666(c) that would have allowed "a fraudster … to structure his loot as salary to evade prosecution"); *United States v. Schmitz*, 634 F.3d 1247, 1264 n.13 (11th Cir. 2011) ("'[A] salary is not bona fide or earned in the usual course of business under § 666(c) if the employee is not entitled to the money.' And, whether wages are bona fide and earned in the usual course of business is generally a question of fact for the

jury to decide." (quoting *United States v. Williams*, 507 F.3d 905, 908 (5th Cir. 2007))).

Section 666(c) provides no shield for Cui because the property appeal work was *itself* the bribe—we cannot separate the work from the (possible) compensation Cui would have paid. Cui did not simply offer compensation for legal work. Rather, Cui offered the property appeal as a bribe because it was legal work. Cui already had a tax attorney, and his emails to Reveliotis and Chin make clear Cui wanted to entice Burke to work on the pole sign permit issue by offering the supposedly "bona fide," more lucrative legal work. Cui's focus was the permit, and his motivation was Burke's power and influence, not Burke's legal expertise. *Cf. Whiteagle*, 759 F.3d at 756 (finding that hiring individual who is "duplicat[ive]" can create inference that hiring was meant to "influence or reward" official). And Burke only took action regarding the pole sign permit after replying to the email regarding the property appeal work. Taking the evidence in the light most favorable to the government, a reasonable jury could easily reject application of § 666(c)'s safe harbor provision—as the jury did at trial.

Third, Cui returns to *Snyder*. He argues *Snyder* requires evidence he sought, and Burke engaged in, an "official act."

> [A]n "official act" is a decision or action on a question, matter, cause, suit, proceeding or controversy[,] … involv[ing] a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee.… To qualify as an "official act" the public official must make a decision or take an action on that question, matter, cause, suit, proceeding or controversy, or agree to do so. That decision or action may

include using his official position to exert pressure on another official to perform an "official act" ….

*McDonnell*, 579 U.S. at 574 (citation modified) (defining "official act" for § 201 purposes).

While *Snyder* did not hold that bribery under § 666(a) has an "official act" requirement, the Court repeatedly referred to an "official act" in discussing the statute. *See generally Snyder*, 603 U.S. 1; *compare O'Donovan*, 126 F.4th at 39 n.14 ("Whether § 666 includes an official-act requirement was not [] a question presented or expressly addressed in *Snyder*."), *with United States v. Macrina*, 109 F.4th 1341, 1351 (11th Cir. 2024) ("As the Supreme Court recently explained in *Snyder v. United States*, a payment after an official act can violate section 666 if an official earlier agrees to the future reward and accepts payment after completion of the act."). Indeed, *Snyder*'s definition of "bribery" under § 666(a)(1)(b) included "official act": "bribes are payments made or agreed to *before an official act* in order to influence the official with respect to that future *official act*." 603 U.S. at 5 (emphasis added).

But Cui's framing of the issue is incorrect. Section 666(a)(2) applies to one who "corruptly gives, offers, or agrees to give anything of value to any person, *with intent to influence or reward*." (emphasis added). It focuses on whether there was a corrupt "intent to influence or reward," not whether the official took an official act or succeeded. *Snyder* confirms this, explaining that, from the bribe-taker's perspective, the focus of bribery is the "intent to be influenced in the official act." *Snyder*, 603 U.S. at 12; *see also, e.g.*, *Hawkins*, 777 F.3d at 883–84 ("A *plan* to take money in exchange for an official act constitutes a scheme to defraud, whether or not the plan succeeds."); *Whiteagle*, 759 F.3d at 753 ("[S]ection

666(a)(2) [] proscribes giving, offering, or agreeing to give a thing of value to someone with the corrupt intent to influence a transaction covered by the statute."); *United States v. Sittenfeld*, 128 F.4th 752, 770 (6th Cir. 2025) ("It is bribery to knowingly accept a bribe even if the official does not intend to be influenced by the bribe in any official act despite the claimed promise to the contrary."). Section § 666(a)(2) asks only whether Cui offered the tax appeal work with the corrupt *intent* to *influence* an official act—not whether Burke took official action.

Cui certainly intended for Burke to take official action—he wanted Burke to convince the CDOB to reverse the pole sign permit denial. At minimum, the evidence shows Cui sought Burke's "us[e of] his official position to exert pressure on *another* official to perform an 'official act.'" *McDonnell*, 579 U.S. at 572. Viewed this way, there is sufficient evidence to meet any "official act" requirement.

### 2. Section 1952(a)(3)

Moving to Cui's next conviction, § 1952(a)(3) reaches anyone who "travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to … promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." The statute defines "unlawful activity" as including "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." § 1952(b). "A Travel Act violation consists of three basic elements: (1) traveling in, or using a facility of, interstate or foreign commerce, (2) with the intent to commit a specified unlawful act, and (3) thereafter performing or attempting to perform that act." *United States v. Dvorkin*, 799 F.3d 867, 876

(7th Cir. 2015). The jury found that Cui violated Illinois state law, specifically bribery, 720 ILCS 5/33-1(a), (d), and commercial bribery, *id.* § 5/29A-1.

To the extent Cui has not waived his underdeveloped argument that the government did not prove he "intended" to bribe Burke, *see Brockett v. Effingham County*, 116 F.4th 680, 686 (7th Cir. 2024) (appellant waives underdeveloped argument on appeal), we reject it. Illinois's bribery statue provides that "[a] person commits bribery when[,] … [w]ith intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he or she promises or tenders to that person any property or personal advantage which he or she is not authorized by law to accept." § 5/33-1(a). The government presented sufficient evidence to find Cui intended "to influence the performance of any act related to the employment, or function, of any public officer [or] public employee." He, repeatedly, emailed Burke asking for help resolving the permit denial and, at the same time, offered the property tax work. And, in his own words, he did so because Burke was a "powerful broker in City Hall" and Cui "need[ed] his favor."

Accordingly, Cui's challenge to his § 1952(a)(3) conviction fails.

### 3. Section 1001(a)(2)

Finally, § 1001(a)(2) provides that it is a crime to "knowingly and willfully" make a materially false statement "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." *See United States v. Edwards*, 869 F.3d 490, 503–04 (7th Cir. 2017). To be material, the statement "must have a natural tendency

to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Turner*, 551 F.3d 657, 663 (7th Cir. 2008) (citation modified) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). "[T]he 'knowingly and willfully' requirement … relates only to the defendant's knowledge and intent that the statements he made to a government entity were false or were made with the conscious purpose of evading the truth." *Lupton*, 620 F.3d at 806. It is not "necessary for an allegedly false statement to have any ill effect at all, as long as it is capable of having such an effect." *United States v. Ranum*, 96 F.3d 1020, 1028 n.12 (7th Cir. 1996).

Viewing the evidence in the light most favorable to the government, the evidence at trial was more than sufficient to support Cui's conviction for making false statements during his 2018 interview with the FBI. The jury heard the recording of Cui's 2018 interview, which further enabled it to evaluate the tone and substance of Cui's statements. True, during the interview Cui told the FBI he offered Burke "property tax appeal" work the first time the FBI asked if he had "offered or suggested any business" to Burke during the time he was trying to resolve the pole sign matter. But the FBI asked that question several additional times during the interview. Each time, Cui responded that it was "not true" he offered Burke the tax appeal work while asking for help with the pole sign, and he answered "no" when the FBI asked if he "ever … offer[ed] business to [Burke] again, right around the time when [he was] seeking help about the pole sign issue?" Perhaps most definitively, he concluded by saying "[t]here was no such offer.… [I]t's just [] false fabricated .… [*sic*]."

Continuing, Cui said he hired Burke for the tax appeal work "just because he's a good tax appeal lawyer" at least three times. Given the evidence at trial, particularly his emails with Chin and Reveliotis, it is not a stretch to conclude there were reasons Cui hired Burke beyond "just" Burke's proficiency as a lawyer—namely, Burke's political influence. Because there was sufficient evidence to find these two sets of statements false, there was sufficient evidence to find Cui falsely told the FBI that everything he said during his interview was accurate.

*       *       *

Cui's sufficiency arguments, at best, pose alternative interpretations of the evidence. Cui had an opportunity to raise these arguments when he went to trial and, after hearing them, the jury convicted Cui. His challenges fail before us as well. The government presented sufficient evidence to convict Cui, and we find his arguments to the contrary unavailing.

**B. Jury Instructions**

Moving to the denial of Cui's Rule 33 motion, he first argues the district court erred in its § 666(a)(2) jury instructions by omitting that the jury must find a "quid pro quo" between Cui and Burke to convict Cui and incorrectly defining the statute's use of "corruptly," warranting a new trial.

"We review the legal accuracy of jury instructions de novo, but we evaluate their particular phrasing for abuse of discretion." *United States v. Siepman*, 107 F.4th 762, 765 (7th Cir. 2024). The district court has "substantial discretion" in constructing the exact language of jury instructions so long as "the instructions as a whole 'represent a complete and correct statement of the law.'" *United States v. Hofschulz*, 105 F.4th 923,

928 (7th Cir. 2024) (quoting *United States v. Bonin*, 932 F.3d 523, 538 (7th Cir. 2019)). We review for abuse of discretion the court's decision to give or refuse a particular instruction. *Siepman*, 107 F.4th at 765.

### 1. Quid Pro Quo

As part of its § 666(a)(2) jury instruction, the district court instructed the jury that to convict Cui, it had to find that he "gave, offered, or agreed to give a thing of value to another person … corruptly with the intent to influence or reward an agent of a local government, or any agency thereof, *in connection with* some business, transaction, or series of transactions of the government." ECF No. 384, at 239 (emphasis added); *see also* The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit at 304 (2023 ed.). At trial, however, Cui proposed instructions that stated the jury must find there was a "quid pro quo" between Cui and Burke and explained that "[a] quid pro quo is an agreement to *exchange* this *for* that, to *exchange* money or something else of value *for* influence in the future." ECF No. 375 at 9 (emphasis added). Cui sees "exchange [for]" as critical to convey that a "quid pro quo" is required, rather than the "in connection with" language of the district court's instruction.

Previously, we have held that § 666(a) does not contain an "additional, specific *quid pro quo* requirement." *United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir. 1997); *see also United States v. Boender*, 649 F.3d 650, 655 (7th Cir. 2011) ("Absent any reasons to reconsider our precedent—and indeed in light of the clear statutory text—we conclude that the government was not required to establish a specific *quid pro quo* of money in exchange for a legislative act."). We grounded this conclusion in our holding that § 666(a) reaches gratuities. *See*

*Boender*, 649 F.3d at 654–55 (holding no "specific *quid pro quo*" required under § 666(a)(2), in part because "§ 666(a)(2) [] criminalizes both bribes and [gratuities] in the same section"). In *Boender* we explained that 18 U.S.C. § 201(c)—the federal gratuity statute—does not require a quid pro quo but instead "requires only the identification of a specific official act 'for or because of which' a [gratuity] was given." *Id.* at 655 (quoting *United States v. Sun-Diamond*, 526 U.S. 398, 406 (1999)). Because, at the time, § 666(a) "criminalize[d] both bribes and [gratuities] in the same section," we declined to import a "quid pro quo" requirement into § 666(a). *Boender*, 649 F.3d at 655. But in *Boender*, we also recognized that § 201(b)—the federal bribery provision—requires a "quid pro quo." *Id.* (citing *Sun-Diamond*, 526 U.S. at 404); *see also United States v. Jones*, 993 F.3d 519, 533 (7th Cir. 2021) (federal bribery "requires evidence of a quid pro quo, the exchange of a thing of value for the violation of an official duty," and "[t]he existence of a quid pro quo is what chiefly distinguishes a bribe from a gratuity").

*Snyder*'s holding that § 666(a) does not reach gratuities now undermines the basis on which we declined to find a quid pro quo requirement in the statute. Because § 666(a) only reaches bribes and a "bribe [under § 666] requires a *quid pro quo*," *United States v. Snyder*, 71 F.4th 555, 579 (7th Cir. 2023), *overruled on other grounds* 603 U.S. 1, it is a fair reading of *Snyder* to find § 666(a) now requires a corrupt intent to enter a "quid pro quo." *See Sun-Diamond*, 526 U.S. at 404–05 (defining a "quid pro quo" as "*a specific intent* to give or receive something of value *in exchange* for an official act" (emphasis added)). *Snyder* made clear that "[a] state or local official can violate § 666 *when he accepts an up-front payment for a future official act* or agrees to a future reward for a future official act." *Snyder*, 603 U.S. at 19 (emphasis added); *see id.* at 23 (Jackson,

J., dissenting) ("There is no dispute that § 666 criminalizes bribes. This Court has also been clear about what a bribe requires: 'a *quid pro quo*.'" (quoting *Sun-Diamond*, 526 U.S. at 404)).

This requirement does not mean the district court gave erroneous jury instructions. The instructions track the language of § 666(a), which uses the "in connection with" language Cui disputes, and *Snyder* does not suggest an issue with that language. Cui's proposed "exchange [for]" language is certainly sufficient to convey that a "quid pro quo" is required. *See, e.g.*, *Sun-Diamond*, 526 U.S. at 404–05; *Salinas v. United States*, 522 U.S. 52, 55 (1997) (characterizing a "series of bribes" as "in exchange for" government action); *United States v. Blagojevich*, 794 F.3d 729, 735 (7th Cir. 2015) (defining "a quid pro quo: a public official performs an official act (or promises to do so) in exchange for a private benefit, such as money"); *United States v. Peleti*, 576 F.3d 377, 384 (7th Cir. 2009). Indeed, as Cui points out, in other cases the government has agreed to include the language Cui proposed here.

But this language is not required. There are no "magic words" needed to convey a "quid pro quo." *See, e.g.*, *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005) (characterizing "[a] *quid pro quo* [as] money *for a* specific legislative act" (emphasis added)). "In exchange [for]," "in connection with," "for a specific act," and "in return [for]" can all sufficiently convey that a quid pro quo is required under § 666(a). That is,

the language of the district court's instructions already conveyed the "quid pro quo" Cui claims necessary.[*]

The district court's jury instructions tracked the language of § 666(a)(2) and made the "quid pro quo" requirement sufficiently clear. Moreover, here, where the evidence showed Cui intended a "quid pro quo" with Burke—he would give Burke the tax appeal work "in connection with" Burke's effort to reverse the permit denial—the district court did not err.

### 2. "Corruptly"

Section 666(a)(2) requires a defendant act "corruptly." The district court instructed the jury that "[a] person acts corruptly when that person acts with the intent that something of value is given or offered to reward or influence an agent of a government in connection with the agent's official duties." ECF No. 384, at 239; *see also* The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit at 304. At trial, Cui objected to this definition of "corruptly" and asked the court to additionally explain that "[a] person acts corruptly when that person acts … *with the knowledge that giving or offering the thing of value is forbidden*." ECF No. 375 at 12 (emphasis added). The district court denied the proposed language, which Cui contends was in error.

---

[*] At oral argument, the government conceded that the "in connection with" language in the jury instructions could be problematic in a case where the evidence might suggest the payment was a gratuity rather than a bribe. Because the evidence here did not suggest Cui offered Burke a gratuity, the instructions were not erroneous. We encourage the Committee on Pattern Criminal Jury Instructions of the Seventh Circuit to address this issue.

"Corruptly" in § 666(a)(2) refers to the "state of mind" of the individual offering the thing of value. *Cf. Blagojevich*, 794 F.3d at 736 (citing *Hawkins*, 777 F.3d at 882) (explaining, for § 666(a)(1)(B), that "'[c]orruptly' refers to the recipient's state of mind"). Because bribery is "inherently corrupt," a person acts "corruptly" when he understands the payment is a bribe. *See Snyder*, 603 U.S. at 5 ("American law generally treats bribes as inherently corrupt and unlawful."); *see also Shen Zhen New World I*, 115 F.4th at 1178 n.3 ("'[C]orruptly' … protects against the possibility that goodwill gift-givers, harboring no intent to receive official action in exchange for their gifts, will later be deemed to have given a bribe."); *United States v. Lindberg*, 39 F.4th 151, 172 (4th Cir. 2022) ("One has the intent to corrupt an official only if he makes a payment or promise with the intent to engage in a *fairly specific* quid pro quo with that official." (quoting *United States v. Jennings*, 160 F.3d 1006, 1018–19 (4th Cir. 1998))). That is, if the individual acts "expect[ing] to achieve a forbidden influence," the individual acts corruptly. *Hawkins*, 777 F.3d at 882; *see also United States v. Mullins*, 800 F.3d 866, 870 (7th Cir. 2015); *United States v. Curescu*, 674 F.3d 735, 742 (7th Cir. 2012) ("To be guilty of soliciting or accepting a bribe in violation of section 666(a)(1)(B) requires knowing that the money or other thing of value received was indeed a bribe, which is to say an inducement to do a corrupt act."). Because a person acts "corruptly" so long as he acts intending the payment to be a bribe, there was no error here—the district court's jury instructions correctly defined "corruptly."

\* \* \*

The district court's § 666(a)(2) instructions accurately reflected the law's quid pro quo requirement and the correct

definition of "corruptly," and the "particular phrasing" of the instructions was far from an abuse of the court's discretion. *Siepman*, 107 F.4th at 765.

## C. Federal Rule of Evidence 404(b)

Next, we turn to Cui's objection to the government's introduction of the photoshopped pole sign photograph Cui sent the CDOB—a separate basis on which Cui seeks a new trial.

We review for abuse of discretion the district court's "decision to admit or exclude evidence," *United States v. Jarigese*, 999 F.3d 464, 470 (7th Cir. 2021), but we will only reverse and order a new trial where the error was not harmless, *United States v. Simon*, 727 F.3d 682, 696 (7th Cir. 2013).

Federal Rule of Evidence 404(b)(1) prohibits admission of "[e]vidence of any other crime, wrong, or act" if introduced "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." That is, evidence of "other crimes, wrongs, or acts" cannot be introduced "if the purpose is to show a person's propensity to behave in a certain way." *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014) (en banc). Rule 404(b)(2) provides a non-exhaustive list of permissible uses for such evidence, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *See also Gomez*, 763 F.3d at 855.

Of course, "Rule 404(b) only curtails the introduction of 'evidence of *other* acts.'" *United States v. Han*, 105 F.4th 986, 993 (7th Cir. 2024) (quoting *United States v. Thomas*, 986 F.3d 723, 728 (7th Cir. 2021)). Direct evidence is "'almost always admissible against a defendant' and is not 'other act evidence.'"

*Thomas*, 986 F.3d at 728 (quoting *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010)).

Finally, as in every case, the court must balance the evidence under Rule 403 and determine "whether the probative value of the [] evidence is substantially outweighed by the risk of unfair prejudice." *Gomez*, 763 F.3d at 860.

Recall that before trial the district court denied Cui's motion to exclude the photoshopped photograph under Rule 404(b)(1), finding the photograph admissible under Rule 404(b)(2)'s exceptions. The court rejected Cui's argument that the government's use of the photograph might lead to an inference that Cui was the type of person who would lie to the government, a propensity inference impermissibly based on evidence of a wrong other than the one at issue.

We agree, moving directly to the district court's Rule 404(b) analysis. To admit evidence under Rule 404(b)(2), "the proponent of the evidence must [] establish that the other act is relevant to a specific purpose other than the person's character or propensity to behave in a certain way," by demonstrating "a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case." *Gomez*, 763 F.3d at 860. The district court found the government satisfied its burden because the photograph went to Cui's "state of mind" when he contacted Burke. It noted the photograph showed Cui's "willingness to take shortcuts—his desperation, even—to" reverse the permit denial. ECF No. 317, at 5. And it further found that the photograph went to Cui's motive and intent, neither of which rely on a propensity-based chain of reasoning. Cui's contention at trial was that the tax appeal work was not a bribe to get Burke

to resolve the permit issue but rather legitimate work with which Cui needed assistance. The photograph contextualizes Cui's state of mind and motive during this time. That Cui sent the CDOB a photoshopped image helped show what Cui was focused on and motivated by at the same time he offered Burke the tax appeal work—i.e., reversing the pole sign permit. These are permissible uses of "other act" evidence and "chains of reasoning" that do not rely on Cui's propensity or character.

Finally, Rule 403—in *Gomez*, we explained that "[o]ther-act evidence raises special concerns about unfair prejudice because it almost always carries some risk that the jury will draw the forbidden propensity inference." 763 F.3d at 857. So, when weighing "other act" evidence under Rule 403, district courts should consider "the extent to which the non-propensity factual proposition actually is contested in the case." *Id.* "Our circuit also requires special caution when other-act evidence is offered to prove intent, which though a permissible non-propensity purpose is nonetheless 'most likely to blend with improper propensity uses.'" *Id.* at 858 (quoting *United States v. Miller*, 673 F.3d 688, 698 (7th Cir. 2012)).

Cui's claim, both in his brief and particularly at oral argument, is that the district court's Rule 403 analysis was "boilerplate" and insufficient. A district court "must tread carefully before admitting other act evidence." *United States v. Morgan*, 929 F.3d 411, 428 (7th Cir. 2019). It must actually "engage in Rule 403 balancing to determine whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice." *United States v. Ferrell*, 816 F.3d 433, 444 (7th Cir. 2015). Here, the experienced district court found

that "[n]ext to the high probative value of the evidence, the risks that [the photograph] will result in unfair prejudice, confusion, or a minitrial appear minimal," ECF No. 317, at 6, and explained that "every piece of negative evidence does not create undue prejudice under Rule 403," *Cui*, 2024 WL 3848513, at *15.

The district court's balancing and ultimate admission of the photograph was not an abuse of discretion. While "a 'bare bones' recitation of Rule 403" can result in an abuse of discretion, we decline to find that here, particularly as the district court engaged in a thorough Rule 404(b) analysis twice before moving to Rule 403—it analyzed the photograph in denying Cui's motion in limine and repeated that analysis in its post-trial denial of Cui's motion for a new trial. *See United States v. Adkins*, 743 F.3d 176, 184 (7th Cir. 2014) ("[I]n this case, the district court provided a sufficiently thorough analysis because it appears, in context, that the district court was relying upon the reasons articulated in its 404(b) analysis."). The photograph went to Cui's state of mind, motive, and intent when offering Burke the tax appeal work, permissible and relevant uses of the photograph. "[I]ntent" is at the crux of liability under § 666(a)(2) and Cui "contested" intent, *Gomez*, 763 F.3d at 857, so the photograph was especially probative. While perhaps brief, the district court's Rule 403 analysis, following its thorough Rule 404(b) analysis, did not amount to an abuse of discretion requiring a new trial. *Jarigese*, 999 F.3d at 470.

Moreover, any error is harmless. *See Gomez*, 763 F.3d at 863. Harmless error asks whether "in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *Id.* (quoting *United States v. Vargas*, 689 F.3d 867, 875 (7th Cir.

2012)). True, the photograph was probative, but, as discussed at length, there was plenty of evidence from which the jury could conclude that Cui intended to and did bribe Burke. Under these circumstances, even if the district court erroneously admitted the photoshopped photograph, its decision was harmless.

## D. Sentencing

Finally, we turn to Cui's sentence. We review the substantive "reasonableness" of the district court's sentence for abuse of discretion, *Gall v. United States*, 552 U.S. 38, 46 (2007), its "application of the U.S. Sentencing Guidelines *de novo*," and the "underlying factual findings for clear error," *United States v. Flores-Olague*, 717 F.3d 526, 530 (7th Cir. 2013).

### 1. Obstruction of Justice

A district court applies a two-level offense enhancement "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. Relevant here, Application Note 4 to § 3C1.1 provides a "non-exhaustive list" of covered conduct, including "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding." Failing to comply with a grand jury subpoena, for example, can provide the basis for a § 3C1.1 enhancement. *See, e.g.*, *United States v. Powell*, 576 F.3d 482, 498 (7th Cir. 2009).

At sentencing, the district court applied the § 3C1.1 enhancement because it determined that Cui obstructed justice when he failed to turn over two key emails to the government following a grand jury subpoena. The district court explained that Cui "was specifically asked for those emails, and he did not turn them over." ECF No. 538, at 23. It found Cui demonstrated the specific intent to obstruct justice because Cui "understood how relevant those emails were," *id.* (citation modified), and Cui exhibited "the proper *mens rea*" because, at the time, his counsel told the government that "no communications are being withheld," which "wasn't really accurate" and showed "his desire to keep those highly relevant emails away from the government," *id.*

We decline to disturb a § 3C1.1 enhancement when the district court's findings are "more than plausible." *United States v. DeLeon*, 603 F.3d 397, 404 (7th Cir. 2010). Cui withheld two key emails directly responsive to a grand jury subpoena. The district court's factual findings are not clearly erroneous. And those factual findings support concluding Cui exhibited the specific intent to obstruct justice by withholding inculpatory emails from the government. As such, the district court appropriately enhanced Cui's sentence under § 3C1.1.

### 2. Sentence Disparity

Section 3553(a)(6) requires courts consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," including "between co-defendants." *United States v. Moore*, 50 F.4th 597, 603 (7th Cir. 2022). The "best way" to avoid disparities is to "follow the Guidelines." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). "[A] sentence within or below a properly calculated Guidelines range necessarily

complies with § 3553(a)(6)." *United States v. Perez*, 21 F.4th 490, 491 (7th Cir. 2021). Indeed, § 3553(a)(6) does not prohibit disparities. Some are okay, even warranted. *See Moore*, 50 F.4th at 606. "[T]he disparity provision 'leaves plenty of room for differences in sentences when warranted under the circumstances.'" *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020) (quoting *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013)). There are a "wide range of circumstances" where a disparity is permitted. *Jarigese*, 999 F.3d at 474.

Cui contends the district court erred, pointing to the 8-month disparity between his sentence and his co-defendant Burke's. But the mere existence of a sentencing disparity does not alone provide a meritorious basis to challenge a sentence. Rather, a district court errs by failing to appropriately consider whether the disparity is warranted.

There was no error here. The district court's sentence was both substantively reasonable—Cui's sentence is 19 months below the low end of his Guidelines range—and the district court properly considered the disparity it created, as § 3553(a)(6) requires. The court explained its rationale for Cui's and Burke's sentences and why it decided the disparity between the sentences was warranted. True, the jury convicted Burke on thirteen counts and Cui on five. But the district court weighed factors such as Burke's age and military service as compared to Cui's obstruction of justice and false statements in finding the disparity justified. Cui's sentence was substantively reasonable and the disparity within the district court's discretion.

\*       \*       \*

The judgment of the district court is

AFFIRMED.